UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

POLYVISION CORPORATION,

       Plaintiff,

v.                                        Case No. 1:03-CV-476

SMART TECHNOLOGIES INC. and          HON. GORDON J. QUIST
SMART TECHNOLOGIES CORPORATION,

       Defendants.
_____/

SMART TECHNOLOGIES, INC.,

       Plaintiff,                            Consolidated with:

v.                                        Case No. 1:04-CV-713

POLYVISION CORPORATION and
PARAGRAM SALES COMPANY, INC.

       Defendants.
_____/

## OPINION

     Plaintiff, PolyVision Corporation ("PolyVision"), has sued Defendants, Smart Technologies,

Inc. and Smart Technologies Corporation (collectively "Smart"), in Case No. 1:03-CV-476, alleging

that Smart is willfully infringing United States Patent No. 5,838,309 (the "'309 patent") and that

PolyVision is not infringing U.S. Patent Nos. 5,448,263 (the "'263 patent") and 6,141,000 (the "'000

patent"), owned by Smart.  Subsequent to the filing of Case No. 1:03-CV-476, this Court received

a related case from the Eastern District of Virginia, captioned *Smart Technologies Inc. v. PolyVision*

*Corporation and Paragram Sales Company, Inc.*, which was assigned Case No. 1:04-CV-713 and consolidated with Case No. 1:03-CV-476. In Case No. 1:04-CV-476, Smart alleges that PolyVision and Defendant Paragram (a seller or distributor of PolyVision's products), have infringed the '263 patent, the '000 patent, and two other patents owned by Smart, United States Patent Nos. 6,337,681 (the "'681 patent"), and 6,747,636 (the "'636 patent") (collectively the "Martin patents"). All of the patents in suit relate to whiteboard technology.

The parties have engaged in extensive discovery and, at the least, exhaustive motion practice, culminating in the filing of a number of motions for summary judgment. The Court has recently issued its memorandum pertaining to claim construction issues for all of the patents. Now before the Court are the following motions regarding the '309 patent: (1) PolyVision's motion for partial summary judgment that claims 6, 10, and 20 are infringed by Smart's 500 Series Smart Board, including Smart models 540, 560, and 580; (2) PolyVision's motion for partial summary judgment dismissing Smart's "best mode" and "enablement defenses"; (3) PolyVision's motion for partial summary judgment that claims 6, 10, and 20 of the '309 patent are not anticipated; and (4) Smart's motion for summary judgment of non-liability regarding the '309 patent. Also before the court are the following motions relating to the Martin patents: (1) PolyVision's motion for partial summary judgment of non-infringement and/or invalidity of claims 8 and 14-19 of the 636 patent; and (2) Smart's motion for summary judgment that PolyVision's IBID, TS, and WT products infringe the Martin patents.

For the reasons set forth below, the Court rules as follows: (1) regarding PolyVision's '309 patent, the Court concludes that Smart's accused products do not infringe, and the Court will therefore deny PolyVision's third motion for summary judgment of infringement of the '309 patent

and grant Smart's motion for summary judgment regarding non-liability for infringement of the '309 patent; (2) regarding the validity of the '309 patent, the Court concludes that is not invalid and will therefore grant PolyVision's second motion for summary judgment dismissing Smart's Section 112 defenses and PolyVision's Fourth motion that the asserted claims of the '309 patent are not anticipated; (3) regarding the use of the term "Windows™" in claims 8 and 14-19 of Smart's '636 patent, the Court concludes that PolyVision's accused products do not infringe because those claims are limited to Windows 3.0 and 3.1 and earlier versions, which PolyVision's products do not use, and will therefore grant PolyVision's first motion for summary judgment that it does not infringe those claims of the '636 patent; and (4) regarding infringement of the Martin patents, the Court concludes that PolyVision's accused products infringe all of the asserted claims except claims 13, 14, and 16 of the '636 patent.

### Summary Judgment Standard

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56. Material facts are facts which are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.*

The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Financial Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986)).

## Discussion

### I.      Motions Pertaining To The '309 Patent

#### A.      Infringement

PolyVision requests summary judgment on its claim that Smart's 500 Series whiteboards, including models 540, 560, and 580 (the "SB5 whiteboard"), infringe claims 6, 10, and 20 of the '309 patent.  PolyVision contends that the SB5 infringes those claims either literally or under the doctrine of equivalents.  Smart has filed its own motion for summary judgment regarding non-liability – the counterpart to PolyVision's motion – that claims 6, 10, and 20 are not infringed by the SB5 whiteboard, either literally or under the doctrine of equivalents.

An accused device may be found to infringe a claim either literally or under the doctrine of equivalents.  "Literal infringement of a claim occurs when every limitation recited in the claim appears in the accused device, i.e., when 'the properly construed claim reads on the accused device exactly.'" *KJC Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1358 (Fed. Cir. 2000) (quoting *Arnhil Enters., Ltd. v. Wawa, Inc.*, 81 F.3d 1554, 1562 (Fed. Cir. 1996)).  A court may grant summary judgment on an issue of literal infringement if "no reasonable jury could find that every limitation recited in the properly construed claim either is or is not found in the accused device." *Bai v. L & L Wings*, 160 F.3d 1350, 1353 (Fed. Cir. 1998).  Even if a claim limitation is not literally present in the accused device, the claim may still be infringed if equivalents of those limitations are present. *See Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1345 (Fed. Cir. 2002).  "Equivalence may be established by a showing by preponderant evidence that an element of an accused device does substantially the same thing in substantially the same way to get substantially the same result as the claim limitation." *Id.* at 1345 (internal quotations omitted).  Summary judgment is proper

4

under the doctrine of equivalents where no reasonable juror could conclude that a claim limitation is met in the accused device by an equivalent. *See Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 20, 39 n.8, 117 S. Ct. 1040, 1053 n.8 (1977).

**1.     Claim 6**

Claim 6 depends upon claim 1, both of which are set forth below.

1.      A self-tensioning membrane digitizer comprising:

a support structure defining a digitizer area and including spacer means;

a tensioned membrane disposed in spaced relationship to said support structure on said spacer means; and

a peripheral flexible member extending from said support structure and including at least two independently flexible sections attached to said membrane and pretensioned counter to the tension of said tensioned membrane for deflecting to maintain tension on said membrane to sustain the spaced relationship with the membrane relative to the structure.

6.      The self-tensioning membrane digitizer claim 1 in which said support structure includes a base and a support substrate mounted on the inside of said base, said spacer means being mounted on said support substrate, said flexible sections extending away from said base and toward said digitizer area.

Below is a reproduction of Smart's SB5 system.



Although the parties argue about the presence or absence of most or all of the limitations of claim 6 in the SB5 system, the Court finds the dispositive issue in the infringement analysis to be whether the peripheral flexible member of the SB5 system, shown above as element G, is "pretensioned."  With regard to the other limitations, based upon its construction of the disputed claim terms, the Court agrees with PolyVision that they are present in the SB5 system, but finds it unnecessary to set forth its reasoning in detail.

Regarding the term "pretensioned," the Court has adopted the following construction offered by Smart: "Flexible member is pushed in a direction to impart or store spring tension in that member before the attachment of the membrane to the flexible member."  The Court observed in its claim construction Memorandum that "pretensioning" according to the above construction is the essence of the "self tensioning" feature of the invention.  It is undisputed that the flexible members or "wings" of the SB5 are not "pretensioned."  Rather, the membrane F is glued to the wings G and the wings are then riveted to the base D.  The wings of the SB5 are not pushed to store spring energy as in the invention of the '309 patent.  This element is missing from the SB5 system, both literally and by equivalents.  Moreover, because the wings are not "pretensioned," the SB5 is not, by definition, a self-tensioning membrane digitizer.

### 2.    Claim 10

Because claim 10 depends on claim 6, the SB5 also does not infringe this claim because it is not a self-tensioning membrane digitizer.  In addition, claim 10 contains the limitation that the "flexible sections are integral."  The Court has construed integral as meaning that the base and flexible section are constructed as a single piece.  Under this construction, the SB5 does not infringe

this claim because the base, or backboard, and the flexible sections, or wings, are not formed as a single piece, but, rather, the flexible sections are riveted to the base.

### 3.    Claim 20

Claim 20 depends upon claim 15, both of which are set forth below.

15.    A self-tensioning membrane digitizer comprising:

a support structure defining a digitizer area;

a membrane disposed in spaced relationship to said support structure; and

a flexible member attached to said support structure and in contact with said membrane, said flexible member biased to tension said membrane and to maintain a spaced relationship of the membrane relative to the digitizer area.

20.    The self-tensioning membrane digitizer of claim 15 in which said support structure includes a base and a support substrate mounted on the base, a spacer means mounted on said support substrate, said membrane stretched over said spacer means, said flexible member extending upwards from said base.

As is the case with claims 6 and 10, the Court finds that the dispositive issue in the infringement analysis is whether the SB5 has a flexible member "biased to tension the membrane," which the parties agree has the same meaning as "pretensioned." As discussed above, the wings or flexible members of the SB5 system are not "biased to tension the membrane" or "pretensioned" because they are not pushed to impart spring energy prior to the attachment of the membrane. For that reason, the SB5 system is not a self-tensioning membrane digitizer as disclosed in claim 20. Thus, the SB5 does not infringe claim 20.

### B.    Invalidity

Smart has raised as a defense and as a counterclaim that the '309 patent is invalid pursuant to 35 U.S.C. § 102 as being anticipated by various prior art references. PolyVision and Smart have

both moved for summary judgment on this defense.  Although the Court has concluded that Smart's products do not infringe the '309 patent, the Court must address Smart's claim of invalidity because "the validity or enforceability of a patent raises issues beyond the initial claim of infringement that are not disposed of by a decision of non-infringement."  *Fort James Corp. v. Solo Cup Co.*, 412 F.3d 1340, 1348 (Fed. Cir. 2005).

"An issued patent is presumed to be valid, and the burden of establishing invalidity as to any claim of a patent rests upon the party asserting such invalidity."  *Impax Labs., Inc. v. Aventis Pharms., Inc.*, 468 F.3d 1366, 1378 (Fed. Cir. 2006) (citing 35 U.S.C. § 282).  The party seeking to invalidate a patent must present clear and convincing evidence.  *See id.*  Invalidity upon the ground of anticipation by prior art under 35 U.S.C. § 102 requires a finding that "each and every limitation is found either expressly or inherently in a single prior art reference."  *Celeritas Techs., Ltd. v. Rockwell Int'l Corp.*, 150 F.3d 1354, 1361 (Fed. Cir. 1998).  Although anticipation is a question of fact, *see Upsher-Smith Labs., Inc. v. Pamlab, L.L.C.*, 412 F.3d 1319, 1322 (Fed. Cir. 2005), summary judgment is appropriate, as in any other type of case, where there is no genuine issue of material fact regarding the presence or absence of limitations in the prior art.  *See id.*

Smart has identified four prior art references which it claims anticipate the '309 patent. Those references are U.S. Patent No. 4,289,925 to Lambden (the "'925 patent"); U.S. Patent No. 3,959,585 to Mattes, et al. (the "'585 patent"); the AT&T Gemini Board; and Smart's prior SB2 tensioning system.

### 1.    The '925 Patent

The '925 patent discloses an "electrographic apparatus" or a "transducer pad", having a concave base (1) and a membrane (4) tensioned by a frame (5).  In this invention, the frame is

mounted on top of the base.  The center portions of each side of the frame are compressed inwardly and the membrane is then attached to the compressed frame.  Tension is applied to the membrane when the frame is released from its compressed state and the frame expands.

The Court concludes that the '925 patent does not anticipate the '309 patent for several reasons.  With regard to claim 6, although the '309 patent discloses a base, it does not include the limitation, "a support substrate mounted on the inside of said base, said spacer means being mounted on said support substrate."  Smart's contention that the "resistive surface 3" is a support substrate fails because the resistive surface supports nothing.  It is screwed into the base inside the nib 2, which in Figs. 1, 5, and 6 serves as the spacer between the flexible membrane and resistive surface.  In addition, to the extent that the frame, shown as 5 in Fig. 1 and 14 in Figs. 5-7, is considered a flexible member, it is mounted on top of the base and does not extend from the edge of the base or support structure in accordance with the Court's construction of claim 6.  In addition to the foregoing reasons, the '925 patent does not anticipate claim 10 for the additional reason that the base and the flexible sections are not integral.  Finally, the '925 patent does not anticipate claim 20 because it does not contain the limitation, "a support substrate mounted on the base, a spacer means mounted on said support substrate."

### 2.    The '585 Patent

The '585 patent discloses a "graphic input terminal."  It includes a plywood base with a spacer board placed on top of the base.  Plastic spacers are placed on the base.  The membrane is stretched over the spacer board and screwed into the opposing side of the plywood base.  Two rows of 1 cm diameter neoprene tubing are placed around the perimeter of the spacer board.

This prior art does not anticipate claims 6 and10 for the obvious reason that the top membrane is not attached to the flexible sections (identified by Smart as the neoprene tubing).  In addition, the neoprene tubing does not extend from the edge of the support structure, and it is not "pretensioned" in accordance with the Court's construction of that term.  Also, with regard to claim 10, the flexible sections and the base are not integral.  With regard to claim 20, the flexible member (neoprene tubing) is not attached to the support structure, nor is it "biased to tension said membrane," or "pretensioned."

### 3.    The AT&T Gemini

The AT&T Gemini Board was apparently the commercial embodiment of the '585 patent obtained by Smart's expert, Dr. Hans Mattes, and others, while Dr. Mattes was employed at Bell Laboratories in the early 1970s.  During discovery, Smart's counsel provided a drawing of the Gemini created by Smart's counsel.  In its response to PolyVision's motion for summary judgment regarding anticipation, Smart submitted a declaration by Dr. Mattes in which he states that he has viewed the Gemini.  In his declaration, Dr. Mattes describes the Gemini board that he examined and provides pictures of it.

Based upon the evidence that Smart has submitted, the Court concludes that the Gemini does not anticipate the '309 patent.  With regard to claim 6, Smart's argument regarding the peripheral flexible member is difficult to follow, but in any event, to the extent that Smart contends that the presser bar and/or spring clips constitute a peripheral flexible member, the argument must fail.  First, the four presser bars are not connected and, therefore, the presser bars cannot form independently flexible sections of the flexible member.  The same is true if Smart contends that the spring clips are the peripheral flexible member.  Second, if Smart contends that the presser bars and spring clips are

the peripheral flexible member, they do not extend from the edge of the support structure.  Rather, the presser bar and the spring clips, in combination, are pressed against and held tight to the support structure.  Finally, there is no indication that the membrane is attached to the asserted flexible sections.  Apart from the lack of "a peripheral flexible member extending from said support structure and including at least two independently flexible sections attached to said membrane," the flexible sections are not pretensioned, as this Court has construed the term.

In addition to the above reasons, claim 10 is not anticipated because the base and the flexible sections are not integral.  With regard to claim 20, because the presser bar and the spring clips are clamped to or pressed against the base, they do not extend upwards from the base.  Moreover, the flexible members are not "biased to tension" the membrane, or "pretensioned."

### 4. The SB2 Tensioning System

This was the tensioning system that Smart used prior to the current allegedly infringing system.  The SB2 system has a composite backboard with a metal C-channel around the perimeter. A rigid wing is attached to the C-channel by a screw, and the membrane is glued to the wing.

As was the case with the other prior art, the SB2 system does not anticipate the '309 patent because it lacks various limitations.  First, with regard to claim 6:  (1) the SB2 has no peripheral flexible member or flexible sections because the C-channels and aluminum wings are fixed in place and are not flexible; and (2) there are no independent flexible sections that are "pretensioned."  With regard to claim 10, any conceivable flexible sections are not integral with the base.  Finally, with regard to claim 20:  (1) there are no flexible sections extending away from the base; and (2) there are no flexible sections "biased to tension said membrane."

11

### C.  PolyVision's Motion For Partial Summary Judgment Regarding Invalidity Under Section 112

Smart asserts in its counterclaim that the '309 patent is invalid because it fails to comply with section 112's "best mode" and "enablement requirements."  Pursuant to 35 U.S.C. § 112, ¶ 1, a specification in a patent "shall contain a written description of the invention, and . . . shall set forth the best mode contemplated by the inventor of carrying out his invention."  This language embodies the "best mode" requirement, the purpose of which is to preclude an applicant from applying for a patent while at the same time concealing from the public preferred embodiments which the inventor has, in fact, conceived.  *See Young Dental Mfg. Co. v. Q3 Special Prods., Inc.*, 112 F.3d 1137, 1144 (Fed. Cir. 1997).  In addition to setting forth the best mode, a specification must set forth "the manner and process of making and using [the invention], in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains . . . to make and use the same."  35 U.S.C. § 112, ¶ 1.  This language embodies the "enablement" requirement, the purpose of which "is to ensure that 'the public knowledge is enriched by the patent specification to a degree at least commensurate with the scope of the claims.'"  *Warner-Lambert Co. v. Teva Pharmaceuticals USA, Inc.*, 418 F.3d 1326, 1336 (Fed. Cir. 2005) (quoting *Nat'l Recovery Techs., Inc. v. Magnetic Separation Sys., Inc.*, 166 F.3d 1190, 1195-96 (Fed. Cir. 1999)).  The Federal Circuit has recognized:

> The best mode requirement differs from the enablement requirement, for failure to enable an invention will produce invalidity whether or not the omission was deliberate, whereas invalidity for omission of a better mode than was revealed requires knowledge of and concealment of that better mode.

*CardiacPacemakers, Inc. v. St. Jude Med., Inc.*, 381 F.3d 1371, 1378 (Fed. Cir. 2004).

"To establish invalidity for failure to disclose the best mode, the party seeking to invalidate the patent must present clear and convincing evidence that the inventor both knew of and concealed

a better mode of carrying out the claimed invention than was set forth in the specification." *Young Dental Mfg. Co.*, 112 F.3d at 1144. The best mode requirement involves two factual inquiries: (1) whether, from a subjective standpoint, at the time of the patent application, the inventor knew of a mode of practicing the claimed invention that he considered to be better than any other; and (2) if the inventor had a best mode, whether the specification adequately disclosed the best method to enable a person of ordinary skill in the part to practice the invention. *See id.* The best mode requirement does not "demand disclosure of every preference an inventor possesses as of the filing date." *Bayer AG v. Schein Pharms., Inc.*, 301 F.3d 1306, 1314-15 (Fed. Cir. 2002). Instead, "the best mode requirement only refers to the invention defined by the claims." *Id.* at 1315. So-called "production details," a term which refers both to commercial considerations that do not affect the quality or nature of the invention, as well as routine details – details that would be apparent to one of ordinary skill in the art regardless of disclosure – need not be disclosed to meet the best mode requirement. *See Young Dental Mfg.*, 112 F.3d at 1144. Generally, cases holding claims invalid for failure to meet the best mode requirement "involved either failure to disclose a preferred embodiment, or else failure to disclose a preference that materially affected making or using the invention." *Bayer AG*, 301 F.3d at 1316.

Smart asserts its best mode defense based upon the following alleged failures to disclose: (1) the substrate "sandwich" structure with steel cladding on the top and on the bottom of a foam core, which structure was selected by the named inventors due to what they considered to be critical weight and "flatness" considerations; (2) the "flatness specification" of the digitizer "base" that might enable the digitizer to be constructed without "spacer dots"; (3) the top sheet lamination construction; (4) the bottom sheet lamination construction; (5) the mechanical jigs or fixtures used

13

to "pretension" the claimed resilient members; (6) the touch algorithm, required to determine that the top sheet had been touched by a user; (7) the strip contacts used on the top sheet and the bottom sheet and the particular manner in which those strip contacts were attached to electrical leads that were then secured to the free end of the pretensioned flexible members, to prevent shorting out of the electrical leads when the top sheet is wrapped around the bottom sheet and the pretensioned flexible members; and (8) the required attachment of the top sheet to the back of the substrate and the lower part of the pretensioned members.

In support of its motion, PolyVision presents declarations by two of the inventors of the '309 patent, Bernard O. Geaghan ("Geaghan") and Stephen R. Robsky ("Robsky"). Geaghan and Robsky both state that the inventors disclosed their best mode of the invention, which is shown in Figure 1 of the '309 patent. (Geaghan Decl. ¶ 10; Robsky Decl. ¶ 9.) Geaghan states that the invention is directed to the tensioning mechanism of the touch membrane digitizer boards and that the particular structure or nature of the board, including the panel or conductive surface, was not part of the invention. (Geaghan Decl. ¶ 11.) He notes that various types of backer boards were used in digitizer board art and other applications, that these backer boards were well-known in the industry, and that Smart had used the honeycomb-type board with success. (*Id.* ¶¶ 5, 13-14.) Similarly, Geaghan confirms that the other items in Smart's list, such as the laminated construction of the sheets or membranes and jigs or fixtures, were either well known in the industry and would have been immediately apparent to one skilled in the art or were a mere production mechanism that was not part of the claimed invention. (*Id.* ¶¶ 17, 20-24.) Smart defends the motion based upon the prior deposition testimonies of Geaghan and Robsky. However, the testimony is taken out of context and does not show that the inventors withheld the best mode. Geaghan testified that the inventors

14

thought that Figure 1 of the '309 patent was the best mode.  (Geaghan Dep. at 57.)  Moreover, nothing in his deposition is contrary to his declaration that many of the items cited by Smart would have been apparent to one skilled in the art or that those items were not important to the claimed invention.  Robsky's deposition testimony also does not support Smart's defense.  The testimony that Smart cites concerns Robsky's thoughts in general on practices by applicants seeking to obtain patents, not on what happened with the '309 patent.  Moreover, Smart fails to rebut PolyVision's argument and evidence that many of the items that Smart says should have been disclosed do not relate to the invention – a tensioning system – and there is no evidence that the inventors considered any undisclosed aspect of their invention to be a best mode.  Thus, PolyVision is entitled to summary judgment on this issue.

In order to meet the enablement requirement, "the specification must provide sufficient teaching such that one skilled in the art could make and use the full scope of the invention without undue experimentation."  *Warner-Lambert Co.*, 418 F.3d at 1337.  Considerations bearing on the issue of enablement include: "(1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims."  *Id.* (quoting *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988)).  A party seeking to maintain an enablement defense must present clear and convincing evidence that the invention is not enabled.  *See Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1072 (Fed. Cir. 2005).

The Court concludes that PolyVision is also entitled to summary judgment on enablement.  Smart's enablement claim is based upon the same failures to disclose that it cited above regarding

15

best mode.  PolyVision has presented evidence that the information that Smart contends should have been disclosed was well-known in the industry and was not required to be disclosed in order to enable a person of ordinary skill in the art to practice the invention.  Smart has not presented any evidence in an attempt to support this argument, such as expert testimony that a person of ordinary skill could not practice the invention.  Therefore, Smart's enablement claim fails.

## II.    Motions Regarding the Martin Patents

### A.    PolyVision's Motion For Partial Summary Judgment Re: Non-infringement And/Or Invalidity Of Claims 8 and 14-19 Of The '636 Patent

The Martin Patents disclose an interactive display system that includes a touch-sensitive screen, a computer, and a projector.  The touch-sensitive display is configured to sense pressure applied to the display screen and, in response, generate control signals indicating locations of the applied pressure, which are sent to the computer.  The computer contains a driver that is configured to receive the control signals.  The computer is configured to execute application programs that generate graphical images based upon the control signals.  The images are sent to the projector, which projects them onto the touch-sensitive screen at the indicated locations.  The display system includes a calibration routine to correct for the effects of "keystoning," which occurs when an image is projected off-center.  The '636 patent relates to the calibration routine.

PolyVision requests that the Court enter partial summary judgment that claims 8 and 14-19 of the '636 patent are invalid and/or not infringed by PolyVision's "TS" and "Walk and Talk" whiteboards.  Each specified claim contains a limitation specifying that the computer in the interactive display apparatus be configured or capable of running an application program in a "Windows™ operating system environment" or having a driver "having code for interacting with

an application running in conjunction with Windows™ software." The specification states that the "MicroSoft 3.0 Windows™ program environment" is used.

The Court has substantially ruled on this motion in its claim construction Memorandum, in which it concluded that the claim terms "Windows™ operating system environment" and "Windows™ software on the computer" as set forth in claims 8, 14-19 of the '636 patent should be limited to "Microsoft Windows Version 3.0." Because it is undisputed that PolyVision's accused products do not use Windows 3.0 or 3.1, as the Court has allowed in its claim construction, or earlier Windows operating systems, PolyVision's products do not literally infringe claims 8 and 14-19 of the '636 patent. The only remaining issue is whether Smart should be permitted to raise the doctrine of equivalents. The Court concludes that it should not be permitted to do so because it has waived such a claim by failing to assert it in a timely manner. It failed to raise the issue in its discovery responses or in a timely-filed expert report. Instead, it first disclosed this argument in its response to PolyVision's motion for summary judgment in a declaration from its expert, Randall Davis, Ph.D. Because Smart's tardy disclosure effectively precluded PolyVision from developing this issue during discovery, the Court will grant PolyVision's motion for summary judgment.

**B.      Smart's Motion For Summary Judgment That PolyVision's Ibid, TS, and WT Products Infringe Smart's Martin Patents**

Smart has moved for summary judgment on its claim that PolyVision's IBID, Webster Touch-Sensitive (TS), and Webster Walk-and-Talk (WT) interactive whiteboards infringe claim l of the '263 patent, claim 27 of the '000 patent, claims 17, 21, 57, and 58 of the '681 patent, and claims 6, 9, 11-14, and 16 of the '636 patent. Smart alleges that PolyVision infringes its patents literally or under the doctrine of equivalents, or, alternatively, contributorily infringes and/or induces

infringement.  In light of its ruling that PolyVision does not infringe claims 14-19 of the '636 patent, the Court will deny Smart's motion with regard to those claims.  Because Smart contends that PolyVision's accused products infringe other claims of the Martin patents not asserted in the instant motion, the claims at issue in this motion will be referred to as the "asserted claims."

PolyVision acquired the IBID interactive whiteboard product in approximately 2000 from MicroTouch Systems, Inc.  In 2001, PolyVision renamed the IBID products the Webster Touch-Sensitive (TS) Series of interactive whiteboard products.  The Webster TS product comes with software that is designed for use in various environments, such as a conference room or a training room.  The software is a 32-bit application that can be run on any PC (200 MHZ or higher) that is running the Windows™ operating system.  The software allows the user to do a number of things, including capturing notes and annotations that are written on the touch-sensitive board.  Before the name change, the IBID software included at least versions 2.0 and 2.1.  Following the name change, the Webster software has included at least versions 2.2, 3.0, 3.1, 3.2, 3.3, and 3.4.  The Webster TS boards come in three sizes: 45"x35" (Model TS 400); 65"x43" (Model TS 600); and 95"x43" (Model TS 800).  PolyVision also produces a line of whiteboard products known as the Webster Walk-and-Talk (WT) series.  The primary difference is that the WT product has a remote control that allows the user to interact with the touch-sensitive board while walking around a room.  The WT product has its own software and, for more advanced features, uses the Webster TS software.  The WT product comes in three models: 45"x35" (Model WT 1400); 65"x43" (Model WT 1600); and 95"x43" (Model WT 1800).

### 1.    Direct Infringement

"[W]hoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of

the patent therefor infringes the patent." 35 U.S.C. § 271(a). Infringement under this Section, or direct infringement, may be established by "evidence that one or more claims of the patent read on the accused device literally or under the doctrine of equivalents." *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1310 (Fed. Cir. 2005). The Federal Circuit has held that when an accused device is capable of operating in an infringing manner, even though it may not have been designed or sold to operate in such a manner, the device must be deemed to infringe. *See Intel Corp. v. United States Int'l Trade Comm'n*, 946 F.2d 821, 832 (Fed. Cir. 1991) ("Because the language of claim 1 refers to 'program*able* selection means' and states 'whereby *when* said alternate addressing mode is selected' (emphasis added), the accused device, to be infringing, need only be capable of operating in the page mode.")

PolyVision contends that its products cannot directly infringe any of the asserted claims because all of the Martin Patents specify either a "projector" or a "projected image," and it is undisputed that its accused products are not manufactured, sold, or shipped with a computer or projector and that nothing in the shipped product has the capability of displaying a computer-generated image on PolyVision's touch-sensitive whiteboard products. As Smart correctly notes, however, claims 6 and 11 of the '636 patent do not specify a projector or a computer. Rather, claim 6 is limited to "a display screen" and "a driver configured to execute an alignment procedure during initialization of said display apparatus." (Col. 16, ll. 3, 8-10.) Similarly, claim 11 does not specify a computer or a projector as limitations. Rather, that claim includes "structure configured to be coupled to a large-screen display surface and generating a control signal in response to pressure applied at the large-screen display surface," "a driver installable in a computer and having code for interacting with an application program that is configured to support simultaneous operation of multiple programs," and "code installable in the computer and configured to cause the computer, in

19

response to user input, to display, on the large-screen display surface and within the edges of the computer-generated image, a plurality of alignment images including an alignment marker." Thus, this claim recites only the software features of the device.

In support of its infringement argument, Smart relies upon the report and supplemental report of its expert witness, Randall Davis, Ph.D. Dr. Davis supports his report and conclusion of infringement with a claim chart analyzing the claim elements and the corresponding structures and/or functions of the accused products, based upon various PolyVision user guides and brochures. With regard to claims 6 and 11 of the '636 patent, Dr. Davis concludes that PolyVision's Webster TS and WT interactive whiteboard products literally infringe those claims.[1]

PolyVision offers several reasons why there is no infringement. With regard to claim 6, PolyVision argues that the claim is invalid because there is no antecedent basis for "the computer" and the claim is therefore indefinite. It also argues that the Webster software is not "configured to execute an alignment procedure during initialization" because the PolyVision drivers execute their alignment procedures only upon a command from the user. Next, it contends that the Webster software does not cause the computer to display a plurality of calibration images including a calibration marker. It points out that there are no "calibration markers"; rather, it notes, there is a single projected image in the form of a rectangle and that users touch the corners of the rectangle to perform the alignment procedure. Finally, PolyVision argues that the Webster software, in its default mode, is not configured to use previous mapping of the display surface to the projected image because it starts from scratch each time it is executed. With regard to claim 11, PolyVision asserts that the Webster software does not infringe because it does not cause the image projected on the

---

[1]Dr. Davis also concludes that a series of interactive whiteboards known as the PTS series that PolyVision Produced for Defendant Paragram Sales Company, Inc. also infringes. The PTS series is apparently a re-branded version of the Webster TS.

large-screen display surface to align with the locations on the large-screen display where pressure is applied by touch. It also repeats its argument that the Webster software does not display a plurality of alignment images because the default 4 point alignment uses a single alignment image.[2]

The Court rejects PolyVision's arguments and agrees with Smart that the Webster TS and WT products infringe claims 6 and 11 of the '636 patent. First, PolyVision's "antecedent basis" claim fails because the issue is whether persons of ordinary skill in the art would understand the claim term "the computer," and that issue may be resolved by examining the specification or the prosecution history. *See Energizer Holdings, Inc. v. Int'l Trade Comm'n*, 435 F.3d 1366, 1370 (Fed. Cir. 2006) ("When the meaning of the claim would reasonably be understood by persons of ordinary skill when read in light of the specification, the claim is not subject to invalidity upon departure from the protocol of 'antecedent basis.'"). Here, the specification and other claims of the patent provide ample guidance for a person of ordinary skill in the art to understand the meaning of "the computer." PolyVision provides no argument to the contrary. PolyVision's contention that the Webster software is not configured to execute an alignment procedure during initialization, as required by claim 6, is contradicted by the Webster Version 3.4 User Guide, which states: "At *startup*, Webster software detects if you are using the PolyVision IRP [interactive rear projection], IPD [interactive plasma display], or FSM [WT flat-screen module] system and *automatically initiates projection mode alignment*." (Webster Version 3.4 User Guide at 24 (italics added).) PolyVision's argument that there is not a plurality of calibration images including a calibration marker fails because PolyVision itself recognizes the presence of these elements in the accused products. According to the Webster Version 3.4 User Guide, users may select from three images providing three levels of alignment,

---

[2]PolyVision repeats several of the same arguments for different claims. Accordingly, the Court will only address such arguments once when first asserted, recognizing that the same argument may be applicable to multiple asserted claims.

including the default 4-point alignment, an 8-point alignment, and a 16-point alignment. (*Id.* at 26-27.) Regarding alignment images, Smart has shown that earlier versions of the Webster product instructed the user to perform the alignment procedure by touching the four cross hair images displayed on the whiteboard. The current version of the Webster software instructs users to "touch each corner of the projected image." Moreover, PolyVision's U.S. Patent Application 2001/0032057, entitled "Initial Calibration of a Location Sensing Whiteboard to a Projected Display," shows that the markers at the corners of the projected image are "alignment images" or calibration points. (U.S. Publ. Appl. No. 2001/0032057, at 6 ("These instructions may request that the user touch the point at which the two lines intersect, that the user touch points located in the four corners of the electronic whiteboard surface, or any other manner which can establish the user touching the surface of the electronic whiteboard at a calibration point.").) These markers are "displayed within the edges of the projected image." (Hildebrandt Dep. at 116-18 (noting that the corners of the blue calibration field are within the white border of the image).) Finally, PolyVision's argument that, in its default mode, the Webster software is not "configured to use a previous mapping of said display surface to the projected image" must be rejected because under *Intel*, where the accused product is capable of operating in an infringing manner, it must be found to infringe, regardless of whether the product was designed or sold to operate in the infringing manner or whether the product was in fact operated in such a manner. *See Intel Corp.*, 946 F.2d at 832. The claim language at issue merely requires that the software be capable of mapping, and the Webster Version 3.4 User Guide specifically states that the software is capable of "[r]emember[ing] alignment points" so that "the same projection alignment [can be used] each time." (Webster Version 3.4 User Guide at 72.)

As for PolyVision's argument regarding claim 11 that the Webster software does not align the displayed image with the locations where pressure is applied, PolyVision's expert, Robert Dezmelyk, testified that the displayed image following correction for keystoning (misalignment) changes because the cursor is relocated to the point of the user's touch on the screen from, where the most recent location data was transmitted.  (Dezmelyk Dep. at 48-49.)  Thus, as in this claim, the Webster TS and WT products are aligned with the location of the touch-pressure applied to the screen.

### 2. Contributory Infringement

Smart also asserts that PolyVision contributorily infringes all of the Martin patents by encouraging its customers to use PolyVision's whiteboard products in a configuration that infringes Smart's patents.  Pursuant to § 271(c),

> [w]hoever offers to sell or sells within the United States . . . a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

35 U.S.C. § 271(c).  In order to establish a claim of contributory infringement, the plaintiff must show an act of direct infringement.  *See Golden Blount, Inc. v. Robert H. Peterson Co.*, 365 F.3d 1054, 1061 (Fed. Cir. 2004).  "Indirect infringement, whether inducement to infringe or contributory infringement, can only arise in the presence of direct infringement, though the direct infringer is typically someone other than the defendant accused of indirect infringement."  *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1272 (Fed. Cir. 2004).  In addition, a plaintiff must make the requisite showing that the infringer had the requisite intent, i.e., that it knew or should have known that its actions would induce actual infringements.  *See Fuji Photo Film Co. v. Jazz Photo*

23

*Corp.*, 394 F.3d 1368, 1377 (Fed. Cir. 2005).  Finally, the plaintiff must show that the defendant's components have "no substantial noninfringing uses."  *Golden Blount, Inc.*, 365 F.3d at 1061 Cir. 2004) (internal quotations omitted).  A non-staple article is "one which was designed to carry out the patented process and has little or no utility outside of that process."  *Polysius Corp. v. Fuller Co.*, 709 F. Supp. 560, 576 (E.D. Pa. 1989), *aff'd* 889 F.2d 1100 (Fed. Cir. 1989).  A court must examine the device as a whole, rather than limiting its examination to just the part capable of practicing the claims of the patent at issue.  *Hodosh v. Block Drug Co.*, 833 F.2d 1575, 1578 (Fed. Cir. 1987).  *See also Haworth Inc. v. Herman Miller Inc.*, 37 U.S.P.Q. 2d 1080, 1089 (W.D. Mich. 1994) ("The focus is not the utility or ubiquity of the infringing configuration; the focus is the utility, presence, and efficiency of the non-infringing configurations.")

### *Direct Infringement*

Smart relies upon both direct and circumstantial evidence to show that users of the Webster TS and WT products combine them with a computer and a projector to operate them in an infringing manner as interactive electronic whiteboards in a projection mode.  Incidentally, the Court notes that there is no dispute that PolyVision's accused products have the capability to operate interactively with a computer and a projector.  This is shown by the various user manuals appended to the report of Dr. Davis, Smart's expert.  Smart's direct evidence of infringement consists of deposition testimony by Peter Hildebrant, PolyVision's Director of Research and Development and Director of Product Management, concerning problems that users were having with the calibration of the screen image, or keystone correction.  (Hildebrandt Dep. at 99-108.)  In addition, Smart has submitted various e-mails between PolyVision and users concerning problems they were encountering with alignment when using the accused products in the projection mode.  (Smart's

Reply Br. Ex. A.)  This evidence amply supports a conclusion of direct infringement.[3]  Apart from its direct evidence, Smart has also presented circumstantial evidence of direct infringement through proof that the accused PolyVision products have the capability to be used to practice Smart's patented invention and by showing that PolyVision's instruction manuals demonstrate the use of the accused products in an infringing configuration.  (Davis Expert Report Exs. G-P.)

PolyVision does not seriously contest the above evidence.  Instead, it argues that Smart has not shown infringement because certain limitations of the Martin patents do not read on the accused products, even if they are combined with a computer and a projector.

PolyVision asserts that its Webster TS and WT products do not infringe claim 1 of the '263 patent for two reasons.  First, it contends that its accused products do not have "means for receiving said control signals and in response generating and projecting graphic images."  It admits that the TS and WT transmit graphical signals containing coordinate information, but it notes that they neither generate graphic images nor project graphic images onto a screen.  It further argues that the Webster software does not generate "alignment images" which could be projected onto whiteboards at "predetermined locations" on the whiteboard as required by limitation (f).  Both of these arguments fail.  Regarding the means for receiving control signals and in response projecting graphic images, Mr. Hildebrandt testified regarding the image displayed by the Webster software – a blue calibration screen with a white line painted around the edge of the image.  (Hildebrandt Dep. at 116-18.)  In addition, PolyVision's own expert, Mr. Dezmelyk, admitted that the alignment image changes after each point or corner is touched by showing an incremented number of touches of

---

[3]PolyVision argues that Hildebrandt's deposition testimony simply addresses the software from various releases of the PolyVision's products, but this is not entirely accurate.  In the cited pages of the deposition transcript, Hildebrandt was asked about e-mails that he received from users concerning alignment problems they were having while using the Webster products in the projection mode.

points on the alignment image.  (Dezmelyk Dep. at 54-55.)  Mr. Dezmelyk also testified, as noted above, that the location of the cursor changes after keystone correction, further indicating that the Webster software is capable of receiving control signals and in response generating and projecting graphic images.

PolyVision's second argument must fail because, as the Court concluded above, the Webster software does project a plurality of alignment images which, according to the Court's claim construction, appear at "predetermined locations" relative to the projected image.  PolyVision asserts that this limitation is not met because it informs users to manually adjust the projector to correct for planar misalignment (by moving it) before attempting to align the projected image.  However, this argument fails because under *Intel*, the Webster software need only have the capability of performing the alignment function.  The fact that it may never be used is immaterial.

PolyVision next asserts that its products do not infringe claim 27 of the '000 patent.  This claim is directed to the use of interactive whiteboards in a network conferencing system.  Claim 27 claims:

> An interactive conferencing system as defined in claim 24 further comprising an initialization routine in the at least one computer of each of said interactive displays, said initialization routine being executed by at least one computer during initialization of said interactive conferencing system to select the configuration of network to which said interactive displays are connected.

Citing Mr. Dezmelyk's expert rebuttal report, PolyVision contends that this claim is not infringed because the Webster software does not contain "an initialization routine . . . to select the configuration of network to which said interactive displays are connected."  Mr. Dezmelyk states that the portions of the Webster User Guides that Smart's expert, Mr. Davis, cites to support his conclusion of infringement, "do not show or establish in any way that the Webster software has an initialization routine that 'select the configuration of [the] network.'"  (Dezmelyk Rebuttal Expert

Report at 12.)  He further states that based upon his own test of the Webster software (Version 3.3.1.19), "no initialization routine is executed that allows a user to 'select the configuration of [the] network.'" (*Id.*)  As Dr. Davis points out in his supplemental report, however, the Webster Version 3.4 User Guide provides instructions regarding two configurations of network conferencing systems. The guide instructs users in establishing a configuration through a NetMeeting conference that permits all participants to use the Webster device.  (Davis Supplemental Expert Report at 24 (citing Webster Version 3.4 User Guide at 60).)  The '000 patent refers to this type of configuration as "[a] two-node network." (Col. 6, ll. 39-42.)  The guide also instructs users in establishing a network that transmits information but does not receive information in a NetMeeting conference, by clicking the "Disable" button under "Copy from NetMeeting into Webster." (Davis Supplemental Expert Report at 24 (citing Webster Version 3.4 User Guide at 60).)  The '000 patent refers to this type of configuration as a "broadcast network." (Col. 6, ll. 44-49.)  Dr. Davis thus concludes that "a user of the TS and WT products that is operating those systems with, for example, NetMeeting to create an interactive conferencing system is able to 'select the configuration of the network' through an initialization routine in at least one of the computers." (Davis Supplemental Expert Report at 24.) As Dr. Davis points out, PolyVision's own manual illustrates two types of network configurations which a user may select  when using the Webster product in a conference setting.  This aligns with and infringes the limitations of claim 27.

PolyVision also cites several reasons why the accused products do not infringe the asserted claims of the '681 patent.  The Court has already concluded in its claim construction rulings that the term "large-screen display surface" in claim 1 is not indefinite.  In addition, the Court has already concluded that the Webster software does cause the computer to "display . . . a plurality of calibration marks."  In addition to these arguments, PolyVision contends that the accused products

do not infringe because the Webster software does not "generate[] a double-click control signal" as required by claims 17 and 57. PolyVision's expert notes that the Webster software does not generate "a double-click control signal" but, rather, that function is performed by the Windows operating system itself. (Dezmelyk Expert Rebuttal Report at 15.) He further states that the Windows functions upon which the Webster software relies do not "provide[] arguments or data structure elements that could be considered as 'double-click control signal[s].'" (*Id.* at 16.) However, Mr. Dezmelyk's opinion appears to focus upon the operation of the Windows system without considering the double click command generated by the Webster software. The '681 patent discloses that "[a] double click command is interpreted, by the Windows™ program, as a function selection request, normally invoked by two touches in succession on a picture icon that represents a program function." (Col. 12, ll. 64-67.) The double-click on the large-screen display surface is thus similar to the double-click on a mouse, which also generates a double-click control signal to the Windows operating system. The Webster software generates a double-click or a double-tap signal: "While in projection mode, you can control your computer from the PolyVision device using the stylus (or your finger on Walk-and-Talk or TS whiteboards): . . . Tap the PolyVision device twice rapidly to double-click." (Webster Version 3.4 User Guide at 27.) This limitation is thus present in the accused devices.[4] As for PolyVision's remaining arguments, the Court has either already addressed them or they are based upon the absence of a computer and a projector from the accused products, and therefore are rejected.

Finally, PolyVision raises a number of arguments concerning the absence of limitations of the asserted claims of the '636 patent in the accused products. The Court has already concluded that

---

[4]PolyVision correctly notes that the accused products would not infringe these claims when used in the Apple Macintosh programming environment, which does not use double-click control signals.

the Webster products infringe claims 6 and 11 of the '636 patent. Based upon its construction of the phrase "sequentially display four calibration marks," the Court agrees with PolyVision that the accused products do not infringe claim 13 because the Webster software displays only three images with calibration marks and not four, as required by claim 13.

### PolyVision's Knowledge

"To show intent for indirect infringement, 'a patentee must be able to demonstrate at least that the alleged inducer had knowledge of the infringing acts.'" *nCube Corp. v. Seachange Int'l, Inc.*, 436 F.3d 1317, 1324 (Fed. Cir. 2006) (quoting *MercExchange, LLC v. eBay, Inc.*, 401 F.3d 1323, 1332 (Fed. Cir. 2005)). In support of this requirement, Smart has submitted a letter dated September 6, 2001, from Smart's U.S. patent counsel to Michael Dunn, PolyVision's President and CEO, advising Mr. Dunn of the claims of the '263 and '000 patents and requesting a response from PolyVision confirming that it had not and would not engage in any activities that would infringe any claim of those patents or, alternatively, requesting a license from Smart. PolyVision does not dispute that this evidence is sufficient to demonstrate its knowledge of Smart's patents and PolyVision's own infringing activities.

### No Substantial Non-infringing Use

The inquiry with regard to whether the defendant's product is a staple article having substantial noninfringing uses focuses on "the thing sold" by the alleged infringer. *Lucent Techs. Inc. v. Gateway, Inc.*, Nos. 02CV2060-B (CAB), 03CV0699-B (CAB), 03CV1108-B (CAB), 2007 WL 925502, at *4 (S.D. Cal. Mar. 19, 2007). *See also AquaTex Indus., Inc. v. Techniche Solutions*, 419 F.3d 1374, 1380 n.** (Fed. Cir. 2005) ("The proper question is not whether Vizorb® is a staple article of commerce, which is readily apparent, but whether the accused Techniche products are 'suitable for substantial noninfringing use[s].'").

Smart cites the supplemental report of its expert, Dr. Davis, to show that PolyVision's products have no substantial noninfringing use.  Dr. Davis states that in his "opinion [] the TS and WT products are not staple articles or commodities of commerce suitable for substantial non-infringing use" and that "the primary and substantial use of the TS and WT products is as electronic, projective, interactive whiteboard systems, as the names of these products imply."  (Davis Supplemental Expert Report at 16, 11.)  Dr. Davis also explains why three of five uses identified by Mr. Dezmelyk are insubstantial and unlikely to motivate consumers to purchase the Webster product. Mr. Dezmelyk identifies the following potential uses of the Webster products by end-users:  (1) as a conventional non-electronic whiteboard, or a simple dry erase board for "informal meetings, small discussions, and brainstorming sessions"; (2) to capture notes written on the board, either for electronic storage or for printing when a printer is attached to the computer, with the whiteboard connected to a personal computer running the Webster software; (3) as a non-electronic screen for displaying projected images, in situations where users wanted to share a presentation without having to configure the computer and whiteboard for interactive operation; (4) in the infringing configuration, combined with a computer, Webster software, and a projector to "interactively control applications software running on the computer"; and (5) as a remote conference system using the whiteboard and projector and a remote conferencing product such as NetMeeting or Webex. (Dezmelyk Expert Rebuttal Report at 6.)  Apart from Mr. Dezmelyk's opinion, PolyVision notes that the documents in the record, including the TS and ST user manuals and the IBID user manual, show several non-infringing uses without a projector, each of which comprises a substantial use for the customer.

In spite of PolyVision's arguments, the Court concludes that Smart has demonstrated that the accused products do not have any substantial noninfringing use and that PolyVision has failed to

create a genuine issue of material fact.  First, with regard to the first and third uses that Mr.

Dezmelyk identified in his rebuttal report – as a simple dry erase board and as a non-electronic

projection screen – Dr. Davis notes, and the Court agrees, that it is unlikely that a customer would

spend thousands of dollars for these electronic interactive whiteboards for such simple purposes

when much cheaper alternatives are available.  Any such uses would thus be merely incidental to the

primary use of the products.  Second, while PolyVision has demonstrated that other uses are

specifically described in the product user manuals, such as printing copies of a presentation with a

printer attached to the computer or storing notes or drawings electronically on a computer using the

Webster software, or using the whiteboard in a conferencing setting, it has offered no evidence that

such uses – without a projector – are substantial.  In fact, the only evidence before the Court shows

that PolyVision customers use the accused products in the interactive projection mode.  Finally, Mr.

Hildebrandt testified that in designing the Webster software, PolyVision was particularly aware of,

and concerned about not infringing, Smart's patents, (Hildebrandt Dep. at 88), indicating that the

focus in the design of the Webster software was on projective, interactive whiteboards.[5]  In short,

PolyVision has failed to present any evidence that any of the noninfringing uses that it has identified

are substantial, and Smart is entitled to summary judgment on contributory infringement.

### 3.      Inducement to Infringe

Pursuant to 35 U.S.C. § 271(b), "[w]hoever actively induces infringement of a patent shall

be liable as an infringer."  In order to establish a claim of inducement, a plaintiff must show that: (1)

there has been direct infringement; and (2) that the alleged infringer knowingly induced infringement

and had the specific intent to encourage another to infringe.  *See MEMC Elec. Materials, Inc. v.*

---

[5]PolyVision argues that only portions of the Webster user manuals are dedicated to use of the TS and WT whiteboards with a projector, but such an argument does not quantify the extent of any noninfringing use, nor is it particularly helpful in determining whether an issue of fact remains with regard to substantial noninfringing use.

31

*Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1378 (Fed. Cir. 2005).  Intent may be shown either through direct or circumstantial evidence.  *See Water Techs. Corp. v. Calco, Ltd.*, 850 F.2d 660, 668 (Fed. Cir. 1988).

As set forth above, Smart has already shown direct infringement by PolyVision.  The only remaining issue is whether Smart has shown that PolyVision had the requisite intent that Smart's patents be infringed.  In support of this element of its claim, Smart has presented evidence that PolyVision was aware of Smart's '263 and '000 patents at least as early as the September 6, 2001, letter and that Smart alleged that PolyVision's whiteboards were being used in an infringing manner. Regarding PolyVision's intent to induce, Smart has presented PolyVision's Webster user manuals which show customers how to use the whiteboards in an infringing manner.  In addition to the user manuals, Smart has presented a WT brochure describing an infringing use of the product.  (Davis Expert Report Ex. L.)  Moreover, as discussed above, PolyVision knew that its customers were using its whiteboard in an infringing manner and provided assistance to them in solving problems that they were having in using the accused devices in an infringing manner.  PolyVision has failed to present any evidence to refute Smart's evidence on this issue.  Accordingly, the Court concludes that Smart is also entitled to summary judgment on its claim of inducement.

## Conclusion

For the foregoing reasons, the Court will grant and deny the pending motions for summary judgment as follows: (1) the Court will deny PolyVision's motion for partial summary judgment that claims 6, 10, and 20 are infringed by Smart's 500 Series Smart Board and grant Smart's motion for summary judgment of non-liability regarding the '309 patent; (2) the Court will grant PolyVision's motions for partial summary judgment regarding the validity of the '309 patent; (3) the Court will grant PolyVision's motion for partial summary judgment of non-infringement of claims 8 and 14-19

of the '636 patent; and (5) the Court will grant Smart's motion for summary judgment that PolyVision's IBID, TS, and WT products infringe the Martin patents, with the exception that PolyVision's accused products do not infringe claim 13, 14, and 16 of the '636 patent.

An Order consistent with this Opinion will be entered.


Dated: June 1, 2007                                         _____/s/ Gordon J. Quist_____
                                                                        GORDON J. QUIST
                                                                UNITED STATES DISTRICT JUDGE