UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

POLYVISION CORPORATION,

       Plaintiff,

v.                                                        Case No. 1:03-CV-476

SMART TECHNOLOGIES INC. and              HON. GORDON J. QUIST
SMART TECHNOLOGIES CORPORATION,

       Defendants.
_____/

SMART TECHNOLOGIES, INC.,

       Plaintiff,                                 Consolidated with:

v.                                                        Case No. 1:04-CV-713

POLYVISION CORPORATION and
PARAGRAM SALES COMPANY, INC.

       Defendants.
_____/

## OPINION

The Court has before it the following motions for reconsideration in connection with the Court's June 1, 2007, Opinion and Order regarding various motions for summary judgment: (1) PolyVision's motion for reconsideration of the denial of its motion for summary judgment of infringement of the '309 patent in Case No. 1:03-CV-476 or, in the alternative, for entry of judgment pursuant to Fed. R. Civ. P. 54(b); (2) PolyVision's motion for reconsideration of the Court's grant of Smart's motion for summary judgment of infringement of claim 27 of Smart's '000 patent in Case No. 1:04-CV-713; and (3) Smart's motion for reconsideration and clarification of the Court's finding

of non-infringement of claim 13 of Smart's '636 patent in Case No. 1:04-CV-713.  The Court has

requested and received responses to these motions.

## Motion Standard

To prevail on a motion for reconsideration, the movant must "not only demonstrate a palpable

defect by which the Court and the parties have been mislead, but [must] also show that a different

disposition of the case must result from a correction thereof."  LCivR 7.4(a).  Moreover, a motion

for reconsideration may not be used to raise issues that could have been raised in the previous

motion, *see Kohl v. Murphy*, 767 F. Supp. 895, 904 (N.D. Ill. 1991), or to introduce evidence which

could have been proffered during the pendency of a summary judgment motion.  *See Thomas Indus.,*

*Inc. v. Wagner Spray Tech Corp.*, 619 F. Supp. 1280, 1284 (E.D. Wis. 1985); *Indep. Petroleum Ass'n*

*of Am. v. Babbitt*, 178 F.R.D. 323, 327 (D.D.C. 1998).

## Discussion

## I.    PolyVision's Motion Regarding the '309 Patent

PolyVision contends that reconsideration of the Court's construction of the claim terms

"pretensioned" and "biased to tension" is required under the Federal Circuit's decision in *Andersen*

*Corp. v. Fiber Composites, LLC*, 474 F.3d 1361 (Fed. Cir. 2007), which, according to PolyVision,

"clarified and narrowed the law on reading manufacturing limitations into product claims."

(PolyVision's Br. Supp. at 2.)  The Court has read *Andersen* and, for the reasons set forth below,

disagrees with PolyVision that *Andersen* compels a different result.

Initially, the Court notes that, contrary to PolyVision's reading, *Andersen* does not appear

to establish any new rule or limitation regarding incorporating "manufacturing limitations" into

product claims.  Rather, it applied well-established rules of construction (in fact, the same rules

2

which this Court applied in its construction of the claims) to reach the particular result in that case.[1]

*Andersen* involved two groups of patents, Group I, which covered compositions capable of being extruded into structural members, and Group II, which covered the extruded structural members themselves.  The district court agreed with the defendant that the term "composite compositions" in the Group I patents were limited to materials that had previously been extruded into either pellet or linear extrudate form.  However, with regard to the term "composite structural members" claimed in the Group II patents, the district court agreed with  Andersen Corp. and held that the members were not limited to items made from a composite mixture that had been extruded into pellet or linear extrudate form, as claimed in the Group I patents.  The Federal Circuit held that the district court erred in its construction of the Group II patents, finding that the scope of the composite structural members was limited to composite structural members in which the preparation of the composite composition includes an intermediate step of pelletization or linear extrusion.  *See id.* at 1375.  The court observed that "[t]he specification . . . indicates that the claimed physical properties of the composite structural members are attributable to the process that is used to make them, a process that includes pelletization."  *Id.* at 1372.  While the court acknowledged that claim construction would be a close question in the case before it if the intrinsic evidence were limited only to the specification, it found that the prosecution history resolved the issue with a clear disavowal of claim scope by requiring pelletization in the process of production of the structural members.  *See id.* at 1373.

---

[1] Although PolyVision first cited *Andersen* in the instant motion for reconsideration, the Court notes that the decision was issued on January 26, 2007, and PolyVision had ample time to bring the decision to the Court's attention prior to its issuance of its claim construction memorandum, had it believed it important to do so.

PolyVision contends that this case is distinguishable from *Andersen*, which limited the product claim to method of manufacture, for several reasons.  First, it contends that contrary to the Court's construction, the specification discloses two embodiments shown in Figures 9 and 10  in which the membrane is attached to the support substrate rather than the flexible members.  It also asserts that the specification describes an embodiment in which one end is fixed and the other is flexible, such that the membrane could be attached to the fixed end prior to the storing of spring energy rather than afterward, as required by the Court's construction.  This argument fails for several reasons.  First, according to the Court's construction, the pretensioning occurs by pushing or imparting spring energy to the flexible member and then attaching the membrane to the flexible member.  The fact that the membrane is attached to the support substrate instead of the flexible member in Figures 9 and 10 is irrelevant because the specification explains that the compressible flexible member in Figure 9 is first pretensioned by compressing it inwardly toward the substrate, following which the membrane is affixed to the bottom of the substrate.  (Col. 4, ll. 65-67 to Col. 5, ll. 1-2.)  Thus, in either situation (attachment to the flexible member or the support substrate), the flexible member is pretensioned (pushed to impart spring energy prior to the attachment of the membrane).  PolyVision's point regarding a fixed-end configuration is unavailing, because even in such a configuration, the flexible member would still be pretensioned prior to attachment of the membrane to either the flexible member or the support structure, as required by the invention.

Second, PolyVision argues that the '309 patent specification contains none of the limiting words present in the patents in *Andersen*, such as "necessary," "critical," or "controlling."  The Court rejects this argument because, as fully set forth in the Court's claim construction memorandum, the specification establishes that pretensioning requires that tension be imparted to the flexible members

prior to the attachment of the membrane.  Thus, while the specification may not contain the exact words of limitation used in the patents in *Andersen*, the specification establishes that the flexible members must be tensioned prior to the attachment of the membrane.

PolyVision's final argument is that, unlike *Andersen*, the prosecution history in this case contains no clear disavowal of claim scope to a specific manufacturing process.  Nothing in *Andersen* suggests that the prosecution history must contain a disclaimer of claim scope limiting the claims to a particular manufacturing process.  The court in *Andersen* looked to the prosecution history only because the specification was not entirely clear with regard to the process limitation. The prosecution history resolved this question.  In this case, the absence of a disclaimer from the prosecution history is irrelevant because the specification provides sufficient guidance on the proper construction of the disputed claim language.

As an alternative request, PolyVision moves the Court to enter final judgment pursuant to Fed. R. Civ. P. 54(B) on its infringement claims and Smart's invalidity counterclaims regarding the '309 patent.  PolyVision contends that although Smart's counterclaims of inequitable conduct and obviousness remain pending, entry of final judgment is appropriate because: (1) Smart's inequitable conduct claim boils down to a determination of fees and costs under 36 U.S.C. § 285 and the Court "inherently dismissed" the majority of Smart's inequitable conduct claim when it rejected Smart's best mode invalidity defense; and (2) Smart is no longer entitled to a jury trial on its obviousness counterclaim because PolyVision's infringement claims have been dismissed.  In the alternative, PolyVision requests that the Court dismiss without prejudice Smart's obviousness and inequitable conduct counterclaims as moot in light of the Court's conclusion that Smart did not infringe the asserted claims of the '309 patent.

Rule 54(b) provides:

> When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

Rule 54(b) relaxes the finality requirement for appellate review, but "it does not tolerate immediate appeal of every action taken by a district court." *Gen. Acquisition, Inc. v. GenCorp, Inc.*, 23 F.3d 1022, 1026 (6th Cir. 1994). The Rule "attempts to strike a balance between the undesireability of piecemeal appeals and the need for making review at a time that best serves the needs of the parties." *Solomon v. Aetna Life Ins. Co.*, 782 F.2d 58, 60 (6th Cir. 1986). Thus, in applying Rule 54(b), the district judge acts as a "dispatcher" who decides whether his or her decision should be released for appellate review. *See Jeannette Sheet Glass Corp. v. United States*, 803 F.2d 1576, 1580 (Fed. Cir. 1986) (quoting *Aleut Tribe v. United States*, 702 F.2d 1015, 1020-21 (Fed. Cir. 1983)).

A district court may enter a judgment in a multi-claim action upon two conditions. First, the judgment or order must be final with regard to the claim in question. *See W.L. Gore & Assocs., Inc. v. Int'l Med. Prosthetics Research Assocs., Inc.*, 975 F.2d 858, 862 (Fed. Cir. 1992). Second, the district court must determine "that there is 'no just reason for delay' in the entry of judgment against one of the parties or regarding one of the claims." *Linear Tech. Corp. v. Impala Linear Corp.*, 31 F. App'x 700, 703 (Fed. Cir. 2002). In determining whether a judgment should be certified under Rule 54(b), a court should consider whether an appellate court will have to decide the same issues

again. *Donnelly Corp. v. Gentex Corp.*, No. 96-1103, 1996 WL 468452, at *3 (Fed. Cir. Aug. 19, 1996) (citing *Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 8, 100 S. Ct. 1460, 1465 (1980)). In addition, although the law of the Federal Circuit applies to a district court's Rule 54(b) determination in a patent case, *see Storage Tech. Corp. v. Cisco Sys., Inc.*, 329 F.3d 823, 830 (Fed. Cir. 2003), the Sixth Circuit has set forth the following "nonexhaustive list" of factors that provide some guidance:

> (1) the relationship between the adjudicated and the unadjudicated claims; (2) the possibility that the need for review might or might not be mooted by future developments in the district court; (3) the possibility that the reviewing court might be obliged to consider the same issue a second time; (4) the presence or absence of a claim or counterclaim which could result in set-off against the judgment sought to be made final; (5) miscellaneous factors such as delay, economic and solvency considerations, shortening the time of trial, frivolity of competing claims, expense, and the like.

*Akers v. Alvey*, 338 F.3d 491, 495 (6th Cir. 2003) (quoting *Corrosioneering v. Thyssen Envtl. Sys.*, 807 F.2d 1279, 1283 (6th Cir. 1986)).

Regarding the first requirement, there is no dispute that the Court's June 1, 2007, Order granting summary judgment to Smart on PolyVision's claims that Smart infringes the '309 patent constitutes "a final judgment on the merits" for purposes of Rule 54(b). That is, the June 1, 2007, Order disposed of all of PolyVision's claims regarding the '309 patent.

The remaining question is whether the competing equities weigh in favor of granting a Rule 54(b) certificate. *See Jeannette Sheet Glass Corp.*, 803 F.2d at 1580. Although PolyVision concedes that Smart's counterclaims of inequitable conduct and obviousness remain pending, it argues, as noted above, that these claims are insignificant. Thus, it argues, judicial economy would be best served by entering a judgment and permitting PolyVision to appeal this Court's rulings on the '309 patent.

7

The Court disagrees with PolyVision's assessment.  First, regarding Smart's inequitable conduct counterclaim, as the Court understands it, Smart is seeking more than merely an award of attorney fees through its assertion of inequitable conduct.  Rather, it is seeking a judgment that the '309 patent is unenforceable – a determination having a much broader scope and impact than the Court's claim construction and order granting summary judgment to Smart on PolyVision's infringement claims.  While the fee request must be considered if Smart prevails on its counterclaim of inequitable conduct, the two determinations are separate and distinct.  Moreover, while it is true, as PolyVision notes, that the Court's entry of summary judgment on Smart's best mode invalidity defense under 35 U.S.C. § 112 limited the scope of Smart's inequitable conduct counterclaim, Smart has shown that its counterclaim includes other allegations of inequitable conduct that were not part of Smart's invalidity defense addressed in the Court's summary judgment ruling.  This counterclaim thus remains a significant issue concerning the '309 patent.

Second, PolyVision cites *In re Technology Licensing Corp.*, 423 F.3d 1286 (Fed. Cir. 2005), as support for its argument that Smart's obviousness counterclaim has been relegated to a bench trial as a result of the Court's dismissal of PolyVision's infringement claims.  As Smart points out, however, *In re Technology Licensing Corp.* is distinguishable from this case because the patentee in *In re Technology Licensing Corp.* abandoned its claim for damages and was proceeding solely on its request for equitable relief, *see id.* at 1289, whereas PolyVision has not abandoned its request for damages.  It is thus far from clear that PolyVision is correct in its assertion that Smart is not entitled to a jury trial on its obviousness counterclaim.  Moreover, Smart is entitled to present this claim to the Court, even if it is not entitled to a jury trial.

In sum, because Smart's remaining counterclaims on the '309 patent are not insignificant, the interests of efficient management of cases and use of judicial resources will best be served by deciding all issues regarding the '309 patent to allow for a single, comprehensive appeal to the Federal Circuit. Handling the case in this manner will streamline the issues and should reduce the time and expense that the parties and the Court must devote to obtaining a final resolution. Finally, in concluding that PolyVision's request should be denied, the Court notes the lack of any assertion by PolyVision that it will be harmed absent a Rule 54(b) certification.[2] Thus, the Court will also deny this aspect of PolyVision's motion.

## II.   PolyVision's Motion Regarding Claim 27 of Smart's '000 Patent

In this motion, PolyVision contends that the Court erred in granting Smart's motion for summary judgment that PolyVision infringes claim 27 of the '000 patent. In particular, PolyVision contends that in reaching its conclusion, the Court failed to address PolyVision's assertion that its accused products do not meet all of the elements of claim 24, upon which claim 27 depends. PolyVision notes that claim 24 requires: (1) "a plurality of interactive displays"; and (2) "a network interconnecting said interactive displays." It asserts that neither of these limitations is practiced by third parties using PolyVision's products, and it says that Smart failed to present any evidence of such third party usage. PolyVision asserts that because there is no evidence that PolyVision or any third party actually uses PolyVision's products as an interactive conferencing system as claimed in claim 24, there can be no finding of infringement.

---

[2] The Court also rejects PolyVision's alternative request to dismiss Smart's counterclaims as moot in light of the Court's ruling of non-infringement. Although the Court has discretion to dismiss Smart's counterclaims as moot, *see Phonometrics, Inc. v. Northern Telecom Inc.*, 133 F.3d 1459, 1468 (Fed. Cir. 1998), the Court concludes that the better practice is to decide the invalidity counterclaims in order to provide guidance on the larger question of whether the '309 patent will be enforceable in a future action. *See Cardinal Chem. Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 99-102, 113 S. Ct. 1967, 1976-78 (1993).

The Court will deny the motion because Smart presented both direct and circumstantial evidence that third parties use PolyVision's products in a manner that infringes claim 24. For example, Smart points to the various e-mails that it attached to its reply to PolyVision's response to Smart's motion for summary judgment. The e-mails are to and from Peter Hildebrant, PolyVision's Director of Research and Development and Director of Product Management, regarding third party usage of PolyVision's products. In particular, Smart cites an e-mail from Hildebrant attaching an email discussing an Emergency Operation Center for the City of Sugar Land, Texas, using dual monitors interconnected by a network. This e-mail describes a setup that infringes claim 24. In addition, as the Court noted in its June 1, 2007 Opinion addressing the summary judgment motions, Smart also provided circumstantial evidence of infringement through the various Webster user manuals attached to the report of Smart's expert, Randall Davis, Ph.D. The manuals provide instructions for establishing various network configurations through a NetMeeting conference so that the accused products can be used as an interactive conferencing system. Combined with evidence of widespread sales of the Webster product, which is capable of being used in an infringing configuration, the manuals provide sufficient circumstantial evidence to establish infringement.

## III.    Smart's Motion For Reconsideration

The final motion for reconsideration is Smart's motion for reconsideration and clarification of the Court's finding of non-infringement of claim 13 of the '636 patent. The Court held that claim 13 was not infringed because "the Webster software displays only three images with calibration marks and not four, as required by claim 13." (6/1/07 Opinion at 29.) Smart contends that in reaching its conclusion of no infringement, the Court "simply confused" the concept of "three images" with the "three modes" of calibration or alignment procedures (4-point, 8-point, and 16-

point) available to a user of the accused PolyVision products. Smart notes that the confusion is apparent from the Court's statement that: "According to the Webster 3.4 User Guide, users may select from three images providing three levels of alignment, including the default 4-point alignment, an 8-point alignment, and a 16-point alignment." (*Id.* at 21-22.) Smart points out that it is more accurate to say that a user may select from among three *modes* (4,8, or 16-point alignment) and that in each mode the accused products will project at least four alignment images.

In concluding that PolyVision does not infringe claim 13, the Court relied upon its construction of the term "sequentially display four calibration marks." The Court defined this term to mean "four calibration marks are displayed individually in four separate successive images." Admittedly, the Court's explanation for its conclusion of non-infringement of claim 13 was not entirely clear. The Court's statement that the accused products do not infringe because the Webster software displays only three images with calibration marks requires clarification. Although the Court's statement that the Webster software displays three images was accurate, in that three separate images are displayed for each of the alignment choices or "modes" (4, 8, and 16-point), Smart correctly notes, as the Court mentioned at pages 25-26 of its Opinion, that the alignment image changes after each corner is touched. Thus, the 4-point mode projects 4 images, the 8-point mode projects 8 images, and the 16-point mode projects sixteen images.

While it is true that the Webster software displays at least four images with calibration marks, it remains the Court's opinion that the accused products do not infringe claim 13, at least where the alignment image is presented as a square. As mentioned above, the Court construed claim 13 to mean that four calibration marks are displayed individually in four separate successive images. The square, as depicted in Smart's Exhibits A-C of its motion for reconsideration, displays all calibration

11

marks (the corners) together in all screens; it does not present individual calibration marks separately in successive individual screens.[3]  In this circumstance, there is no infringement under the Court's construction of claim 13.  However, Smart points out the earlier versions of the Webster software, Versions 2.0-2.2, used a cross hair projected separately in each of four successive alignment images. Versions 2.0-2.2 thus infringe under the Court's construction.  Therefore, the Court will grant Smart's motion, in part, as it pertains to Webster Versions 2.0-2.2.

## Conclusion

For the foregoing reasons, the Court will deny PolyVision's two motions for reconsideration and grant Smart's motion for reconsideration and clarification in part.

An Order consistent with this Opinion will be entered.


Dated:  September 7, 2007                              /s/ Gordon J. Quist
                                                  GORDON J. QUIST
                                                  UNITED STATES DISTRICT JUDGE

---

[3]The Court previously reviewed these exhibits in the DVD that Smart presented at the March 5, 2007, hearing.

12